**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**EL DORADO DIVISION**

IN RE PILGRIM'S PRIDE                    MDL DOCKET No. 1:07-CV-1832
FAIR LABOR STANDARDS
ACT LITIGATION

THIS DOCUMENT RELATES TO:
All Actions

### PLAINTIFFS' MOTION FOR APPROVAL OF SETTLEMENT AGREEMENT

**I.     OVERVIEW OF THE SETTLEMENT**

The Plaintiffs in this action, which is comprised of 15 separate cases transferred to this

Court by the Judicial Panel on Multidistrict Litigation, hereby request approval of the Settlement

Agreement ("Agreement") between Plaintiffs and Pilgrim's Pride Corporation ("PPC"), attached

as Ex. A.  PPC has no objection to this Motion and supports approval of the attached Agreement.

The parties jointly submit that the Agreement is a fair, adequate and reasonable resolution of a

bona fide dispute.  The Plaintiffs are current and former hourly poultry processing workers who

allege that PPC violated the Fair Labor Standards Act ("FLSA") by failing to compensate them

for all time worked between the first and last compensable acts of a continuous workday, less

bona fide meal breaks, including, time spent donning, doffing, and cleaning required sanitary and

protective gear, and walking to and from the production line.  *See* Consol. Compl. ¶¶ 1, 3 (doc.

21).  These actions have been certified as collective actions under 29 U.S.C. 216(b),

encompassing workers from 23 PPC facilities located in 11 states.

The Agreement provides the eligible workers with approximately 85% of the back pay

recoverable if Plaintiffs had prevailed in establishing liability at an estimation hearing and been

awarded the full amount of single damages payable to the class for the two-year period for which back pay can ordinarily be recovered.

The Agreement presents a fair and reasonable resolution of a bona fide dispute over the compensability of time expended by poultry processing workers donning, doffing and cleaning sanitary and protective equipment and walking to and from the production line.  During the four years in which this case has been pending, the parties have been represented by experienced counsel who have vigorously represented the interests of their respective clients.  Recognizing that an estimation hearing to resolve this action would have presented risks for each side, the parties entered into this Agreement after being fully informed of the record and the unresolved legal issues that the Court would have had to adjudicate.  The parties negotiated the Agreement at arms-length with the aid of an experienced mediator after extensive discovery and investigation of these claims.  Accordingly, Plaintiffs request that the Court grant this Motion, approve the Agreement, and enter the proposed Order, attached hereto.

## II.   <u>HISTORY OF THE LITIGATION</u>

### A.    <u>MDL Coordination of Related Lawsuits</u>

Beginning in March and April of 2006, workers at Pilgrim's poultry processing facilities filed complaints on behalf of themselves and similarly situated workers for unpaid overtime. *See, e.g., Moya v. Pilgrim's Pride Corp.*, 2:06-cv-01249-MK (E.D. Pa.) (filed March 23, 2006); *Antee v. Pilgrim's Pride,* Civ. No. 06-0089 (E.D. Tex.) (filed Apr. 20, 2006).  The JPML transferred all related actions against PPC to this Court for pretrial proceedings, pursuant to 28 U.S.C. § 1407.  Transfer Order, May 10, 2007, (doc. 1-1).  This Court consolidated 12 private

lawsuits,[1] filed by workers at PPC's chicken processing plants and authorized the filing of a Consolidated Complaint.  Case Management Order 3 ("CMO-3"), doc. 39.  The JPML additionally transferred three previously consolidated actions involving two turkey processing facilities in Pennsylvania for coordinated pretrial proceedings. ("Pennsylvania action").  *Moya*, 2:06-cv-01249-MK.

On August 6, 2007, the United States Department of Labor initiated litigation against PPC in the Northern District of Texas, alleging FLSA violations concerning virtually the same donning and doffing issues and seeking back pay and liquidated damages for chicken processing workers at a single Dallas, Texas plant as well as company-wide injunctive relief.  *Solis v. Pilgrim's Pride Corp.,* No. 3:07-cv-1352-B, (N.D. Tex.).[2]  On February 15, 2008, the JPML transferred the DOL Litigation to this Court for coordinated pretrial proceedings.

### B.     Litigation before this Court in MDL Action

On March 13, 2008, the Court conditionally certified a single collective action under § 216(b) of the FLSA, encompassing "all current and former Pilgrim's employees who have held non-exempt positions working on or near the chicken processing line," from 21 plants employed

---

[1] *Aaron v. Pilgrim's Pride,* Civ. No. 07-1082 (W.D. Ark.), filed 8/22/06 (company-wide); *Antee v. Pilgrim's Pride,* Civ. No. 06-0089 (E.D. Tex.) 4/20/06 (company-wide); *Aguilar v. Pilgrim's Pride,* No. 06-1673 (N.D. Ala.) 8/23/06, (Enterprise & Athens, AL); *Benford v. Pilgrim's Pride,* Civ. No. 06-2337 (N.D. Ala.) 11/2/06 (Athens, AL); *Allen v. Pilgrim's Pride,* Civ. No. 07-0019 (M.D. Ga.) 3/5/07 (Athens, GA); *Brown v. Pilgrim's Pride,* Civ. No. 07-0024 (M.D. Ga.), 3/14/07 (Elberton, GA); *Roebuck v. Pilgrim's Pride,* Civ. No. 07-0052 (M.D. Ga.) 5/22/07 (Elberton, GA); *Price v. Pilgrim's Pride,* Civ. No. 07-1156 (N.D. Ga.) 5/21/07 (Canton, GA); *Hernandez v. Pilgrim's Pride,* Civ. No. 07-0020 (N.D. Ga.) 1/30/07 (Dalton, GA); *Hammond v. Pilgrim's Pride,* Civ. No. 07-0056 (N.D. Ga.) 5/23/07 (Gainesville, GA); *Joiner v. Pilgrim's Pride,* Civ. No. 07-0029 (W.D. Ky.) 2/26/07 (Hickory, KY); *Porter v. Pilgrim's Pride,* Civ. No. 06-0259 (E.D. Tenn.)12/7/06 (Chattanooga, TN).

[2]  Because of the DOL lawsuit, Plaintiffs no longer sought to include workers at Dallas plant in their action.  *See* 29 U.S.C. § 216(b) (right to become a party plaintiff terminates upon DOL filing complaint).

as early as April 20, 2006.  *See* Order (doc. 51).  The Named Plaintiffs in the Consolidated

Complaint, Stephania Aaron, Alice Shepard, Dorothy Webb, Cynthia Rayborn, Erica Gresham,

Freida Brown, Laronda Carruthers, Renee Pates, John Chambers, Rose Mary Porter, LaShedria

Traylor and Melissa Hott, represent themselves and all similarly situated workers in this

collective action.  Consol. Compl., doc. 21.[3]

The notice administrator sent a court-approved notice and consent form in English and

Spanish to approximately 55,000 former and current hourly line workers of PPC.  *See* Order,

May 14, 2008, docs. 51, 51-1.  Over 10,000 workers filed consents to join this action.  On

November 25, 2008, after a hearing and briefing, the Court entered a comprehensive discovery

order setting forth a schedule permitting discovery of eight test facilities over one year.  Order at

¶ 5, (doc. 60). On November 25, 2008, Plaintiffs moved to amend their complaint to add four

corporate officers of PPC as individual defendants, seeking to hold them jointly and severally

liable for the challenged wage and hour practices in violation of the FLSA. (doc. 61).

### C.   Bankruptcy Court Proceedings

On December 1, 2008, PPC commenced with the United States Bankruptcy Court for the

Northern District of Texas (the "Bankruptcy Court") voluntary cases under chapter 11 of the

Bankruptcy Code.  The bankruptcy filing imposed an automatic stay on Plaintiffs' action.  On

January 12, 2009, PPC moved to extend the automatic stay to the four individual defendants

whom Plaintiffs had sought to add to their complaint.  After Plaintiffs filed an objection (Br. doc.

515), the Bankruptcy Court, on February 11, 2009, denied PPC's motion to extend the stay

---

[3]  The Pennsylvania collective action, represented by named plaintiffs Esperanza Moya, Fé
Altagracia Moya, Anita Perez, Victor Rivera, Jorge Hernandez, and Alejandro Rosado, includes
approximately 346 workers employed as of March 23, 2003. *See Moya,* 2:06-cv-01249-MK,
Order, Apr. 11, 2006 (doc. 9).

without prejudice to the filing of an adversary proceeding.  On February 5, 2009, Plaintiffs filed

a Motion for Relief from the Automatic Stay imposed by the bankruptcy filing (Br. doc. 777).  In

March 2009, the parties engaged in a good faith effort to resolve this action and engaged the

services of an experienced mediator, Hunter R. Hughes, Esq.  The parties participated in a full-

day mediation in Dallas, Texas on May 5, 2009; however, the mediation ended without an

agreement.

1.   <u>Bankruptcy Court's Approval of Expedited Discovery</u>

On June 1, 2009, Plaintiffs filed a Master Proof of Claim in the bankruptcy proceeding on

behalf of all workers who had consented to join the collective action.  On June 30, 2009, the

Bankruptcy Court granted limited relief from the automatic stay to allow discovery in this and a

similar FLSA action, *Benbow v. Gold Kist, Inc.,* 3:06-cv-2751 (D.C.S.C),  a certified collective

action of approximately 3,000 workers from facilities PPC acquired from Gold Kist in 2006. (Br.

doc. 2501).   On July 8, 2009, PPC filed a motion requesting that the Bankruptcy Court estimate

the claims in both actions.  On August 19, 2009, the Bankruptcy Court entered an agreed

Discovery Order, which established an expedited discovery schedule in preparation for an

estimation hearing. (Br. doc. 3080).

On September 10, 2009, the Bankruptcy Court issued a Report and Recommendation

approving the parties' Agreed Motion to Transfer Venue of Plaintiffs' claims to this Court to

preside over an estimation hearing and related procedures.  (Br. doc. 3295).  This Court agreed to

hold a two-week estimation hearing, where it would determine whether liability existed at all 23

facilities and, if so, an estimation of the amount, if any, of back pay, damages and attorneys' fees

and costs that should be paid to the Plaintiffs.  The estimation hearing would have resolved the

case for all purposes instead of a trial.

In preparation for the estimation hearing, the parties agreed to select five representative plants at which to conduct discovery to serve as a basis for resolving the action.  Over approximately three months, the parties took approximately 50 depositions and reviewed tens of thousands of pages of documents.  Both parties hired experts to perform time studies at various plants to measure the alleged unpaid time at issue.  Plaintiffs also hired an expert in labor economics to analyze pay and time records and calculate damages.  *See* Sellers Decl. ¶¶ 5-6. During the course of discovery, the parties conducted ongoing settlement discussions with the aid of the mediator.  After the completion of the bulk of discovery, on November 10, 2010, approximately two weeks prior to the estimation hearing, the parties reached a settlement in principle, the terms of which are set forth at Ex. A.  On December 10, 2009, the Bankruptcy Court entered an order confirming Debtors' Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code.  The Plan became effective on December 28, 2009. Accordingly, the Court may approve this Agreement for all purposes. *See* Br. doc. 3295.

    2. <u>PPC Settlement of SC and DOL Actions.</u>

PPC has recently settled two additional actions involving similar FLSA claims for unpaid time spent donning and doffing required protective gear.  On December 8, 2009, the Bankruptcy Court preliminarily approved a settlement of *Benbow v. Gold Kist, Inc.,* 3:06-cv-2751 (D.C.S.C), and the parties filed a joint motion for final approval on March 22, 2010.  *See* Prelim. Approval Order (doc. 4371); Mt for Final Approval (Br. doc. 4916).  Pursuant to the settlement PPC will pay $1,750,000 to resolve all claims, of which $700,000 will be paid in backpay and damages to approximately 3,000 workers who consented to join the case and $1,050,000 will be paid in attorneys' fees, costs and expenses.  The average award payable to the workers will be approximately $235.  *Id*.

Additionally, on February 1, 2010, this Court approved a Consent Judgment with the DOL under which PPC, without admitting a violation of the FLSA, agreed to injunctive relief and the payment of $1,001,438.07 in backpay to production line workers at its Dallas, Texas plant. Consent Judgment, doc 8 at 4.  PPC will pay hourly production line employees for all hours worked from the start of the first principal activity to the conclusion of the last principle activity of the workday, other than bona fide breaks.  *Id.* at 2.  PPC will fully implement this pay practice at nonunion facilities within 24 months, and during the interim period, PPC will pay workers for a percentage of the time used to determine backpay for the Dallas workers.  *Id.* at 2-3.  At the request of the applicable union, PPC will similarly change its pay practice within 24 months at unionized facilities; however, workers there will not be entitled to any interim pay, as the DOL has taken the position that such time may be excluded from compensation for working time under 29 U.S.C. § 203(o).  *Id.* at 3.

## III.    SUMMARY OF THE SETTLEMENT AGREEMENT PROVISIONS

### A.    Monetary Payment for the Benefit of the Class

This Agreement provides that PPC will make a payment of ten million dollars ($10,000,000) for the benefit of members of the collective action, including back wages and damages for eligible workers, as well as attorneys' fees and expenses incurred in litigating this action.[4]  From this amount, $687,045.19 will be deducted before other distributions are made, to defray costs and expenses incurred in litigating all actions, in accordance with the retainer agreements with the Named Plaintiffs.  *See* Agreement ¶5(a)(1), Ex. A; Declaration of Joseph M. Sellers, attached here ("Sellers Decl.") ¶ 4, Ex. B.

---

[4] PPC has expressed no opinion as to the allocation of this payment between the Plaintiffs and their attorneys.

Of the remaining $9,312,955.81 in settlement proceeds, $4,700,000 will be disbursed to eligible workers who consented to participate in this action in satisfaction of all claims to monetary relief they may have in this action and payment of service awards to workers for their extra efforts to participate in the litigation.  Agreement ¶ 5.a.1, Ex. A; Sellers Decl. ¶ 5, Ex. B.  This sum represents approximately 85% of the full amount of single damages Plaintiffs would recover if they were to prevail at an estimation hearing.  Sellers Decl. ¶ 4, Ex. B.  This damage calculation is based on the time studies conducted by Plaintiffs' expert in industrial engineering, Dr. Kenneth Mericle who served as an expert for the Plaintiffs in *IBP v. Alvarez*, 546 U.S. 21 (2005), as well as other cases alleging violations of the wage and hour laws for failing to pay for donning and doffing activities.  Agreement  ¶¶ 5-6, Ex. A.  Plaintiffs' labor economics expert, Dr. Louis Lanier, calculated damages based upon an analysis of PPC's pay and time records from across its facilities to determine the number of compensable work weeks under the generally applicable two-year statute of limitations period.  The Agreement provides an explanation of the allocation of the settlement proceeds to each individual.  *Id*. ¶ 6.b.  Based on a preliminary damage analysis of the eligible workers thus far identified, the awards range from over $3,000 per worker to a minimum of $50 per worker, with the average award of approximately $535.00 (less applicable tax withholdings).  The Settlement Administrator will mail a distribution check to each eligible worker along with a notice, attached as Ex.1 to the Agreement, in both English and Spanish, explaining the terms and effect of the Agreement.  *Id.* ¶ 6.d.

In addition, counsel requests that service awards be made to the Named Plaintiffs and other workers in recognition of their contributions to the case by participating in discovery and case development as well as the risks imposed on them and time required by participating in this

litigation.[5]  Counsel has requested the Court approve the following service awards: (1) $5,000 to

each of the 12 Named Plaintiffs in the Consolidated Complaint; (2) $2,500 to each of 30

additional workers who provided deposition testimony; (3) $1,000 to each of 25 additional

workers who provided declarations supporting certification of the MDL action.  Agreement ¶

6.b, Ex. A; Sellers Decl. ¶ 7, Ex. B.  The proposed  service awards total approximately $160,000,

which is less than 1% of the total payment to the eligible workers.  *Sellers* Decl. ¶ 7, Ex. B.  The

service award requests are comparable to awards approved by courts in similar actions.[6]

Finally, Plaintiffs request that the Court award $4,612,954.81 to class counsel as payment

of attorneys' fees.  Pursuant to CMO-3, counsel have agreed amongst themselves on the

allocation of fees among counsel.  The total amount payable as attorneys' fees represents

approximately 68% of the actual lodestar fees generated by all counsel in prosecuting the actions

in the underlying courts, MDL proceeding, bankruptcy court and settlement proceedings.  Sellers

Decl. ¶ 8, Ex. B.  The firms representing Plaintiffs have expended a total of approximately

---

[5] *See e.g., Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (relevant factors in reviewing service awards include actions taken to protect class' interests, degree to which class has benefitted from those actions, and amount of time and effort plaintiff expended in pursuing litigation); *Velez v. Majik Cleaning Serv., Inc,* No. 03 Civ. 8698 (SAS)(KNF), 2007 U.S. Dist. Lexis 46223, *23 (S.D.N.Y. June 22, 2007) (class representatives entitled to service award because they exposed themselves to potential adverse actions by former employer and co-workers and dedicated a significant amount of time to the case).

[6]  *See, e.g., Camp v. Progressive Corp.,* No. Civ. A. 01-2680, 2004 WL 2149079, at *6 (E.D. La. Sept. 23, 2004) (awarding service award of $10,000 to named plaintiff; $2,500 to any other plaintiff deposed; $1,000 to other plaintiffs participating in discovery); *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 187 (W.D.N.Y. 2005) (approving service award of $10,523 to class representative, representing 8.4% of the settlement fund,); *Quintanilla v. A&R Demolition Inc.*, Civil Action No. H-04-1965, 2007 WL 5166849, at *3 (S.D. Tex. May 7, 2007) (service awards of $1000 given to each named plaintiff); *In re Janney Montgomery Scott LLC Fin. Consultant Litig.,* No. 06-3202, 2009 WL 2137224, *34-36, (E.D. Pa. July 16, 2009) (approving $20,000 services awards for named plaintiffs); *Trotter v. Perdue Farms*, 253 F.Supp.2d 812, 815 (D.De 2003) (service award of $5,000 to each named plaintiff in donning and doffing action).

19,621 hours pursuing this litigation, which translates into an average hourly rate of $235.10 per hour based upon the attorney's fee award requested. *Id.*

   B.      **Process for Finalizing List of Workers Eligible to Recover**

   Counsel for the parties have identified over 8,400 workers whom the parties agree are eligible to participate in the settlement.  The parties have identified over 10,000 workers who filed consents to join this action.[7]  Counsel have engaged in an ongoing process of identifying duplicate consents filed by the same person and confirming that each individual worked for PPC in a job position and plant covered by these collective actions within the statute of limitations period.  *See* Order, doc. 51.  To date, PPC has identified approximately 2,000 workers who, according to its records, did not work in a covered job position or facility or did not work a sufficient number of hours per week to qualify for overtime during the relevant time period, ("excluded workers").  In addition, the parties have identified over 300 individuals who filed consents who the parties have been unable to confirm as current or former PPC employees based on PPC's employment records as well as letters and calls to their last known address and phone number ("unconfirmed workers").  Plaintiffs request that the Court enter the attached Proposed Order, which directs the Settlement Administrator to provide notice to the last known address for each excluded and unconfirmed worker advising that he or she must provide the Settlement Administrator with the information needed to verify his or her eligibility to participate in this action or the individual's claims will be dismissed.[8]  The Settlement Administrator will mail a

---

[7] Over 13,600 consents were filed in the MDL action and underlying cases, and the parties have worked to remove duplicate consents filed by the same person from this number.

[8] The Settlement Administrator will establish a procedure for confirming the eligibility of workers to participate in the settlement, such as the provision of relevant employment documents or an employee identification number, and will resolve any disputes over whether an individual

notice, in both English and Spanish, in the form attached as Ex. C (notice to excluded workers) and Ex. D (notice to unconfirmed workers), to each individual's last known address, setting forth the procedure for verification or dismissal of their claims.  PPC agrees with this proposal.

Plaintiffs request that the Court retain jurisdiction over this action until the administration of the Agreement has been completed to address any questions or disputes that may arise.  The parties shall report to the Court on the status of the distribution of funds within 30 days after the distribution of all settlement checks and any remaining and unclaimed funds as provided in ¶ 6.f of the Agreement.  The Settlement Administrator will establish a qualified settlement fund and issue settlement checks as soon as practicable after the May 7, 2010 deadline for unconfirmed or excluded workers to verify their eligibility to participate in the settlement.  Any settlement checks that are not cashed within 180 days of issuance will expire.  Agreement ¶ 6(f), Ex. A. After fully funding the settlement, the Settlement Administrator will distribute any unclaimed funds up to $200,000 to PPC to offset the cost of administration of the settlement.  If the undisbursed funds remaining exceed $200,000, Plaintiffs' counsel will recommend to the Court how such funds should be disbursed and will implement the plan the Court adopts. *Id*.  As soon as practicable thereafter, Plaintiffs' counsel shall take the steps necessary to dismiss this action. *See id*. ¶ 4(c).

## IV.   LEGAL STANDARD FOR DETERMINING WHETHER TO APPROVE SETTLEMENT

When reviewing the proposed settlement of claims under the FLSA, a court must "scrutinize[e] the settlement for fairness" and decide whether the proposed settlement is a "fair and reasonable resolution of a bona fide dispute over FLSA provisions." *Lynn's Food Stores,*

---

has provided sufficient proof of employment with PPC in a covered position in the applicable time period.

*Inc. v. United States*, 679 F.2d 1350, 1355 (11th Cir. 1982).  Private parties may not settle a

FLSA action absent court approval or supervision by the Secretary of Labor in order to protect

against settlements that allow substandard wages to persist.  *See Brooklyn Savings Bank v.*

*O'Neil*, 324 U.S. 697, 706-7 (1945); *Copeland v. ABB, Inc.,* 521 F.3d 1010, 1014 (8th Cir. 2008).

This collective action has been certified under § 216(b) of the FLSA. The collective

action procedure differs from a Fed. R. Civ. P. 23 class action, as each employee must provide

consent in writing to join the action.  *See Schmidt v. Fuller Brush Co.,* 527 F.2d 532, 536 (8th

Cir. 1975).  Accordingly, the primary focus of a court's inquiry when reviewing a settlement of

claims under the FLSA is to ensure that the settlement reflects a fair resolution of the claims and

not, as Rule 23, Fed. R. Civ. P., requires, that the due process interests of absent class members

be protected.  *See Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714, 721-22 (E.D. La.

2008); *Moore v. Ackerman Inv. Co.*, No. C 07-3058-MWB, 2009 WL 2848858, *2 (N.D. Iowa,

Sept. 1, 2009).

Thus, approval of a FLSA collective action settlement, does not require the two-step

process of preliminary approval, notice to the class, and an opportunity to object ordinarily

required under Rule 23.  *See Moore,* 2009 WL 2848858, at *2 (unlike Rule 23 action § 216(b)

"does not expressly require a 'fairness' hearing on a proposed settlement"); *Collins*, 568 F. Supp.

2d at 721-22; 5 Moore's Federal Practice 23.04(1).  Since members of a FLSA collective action

must consent to join the suit and agree to be represented by the Named Plaintiffs and counsel,

preliminary notice of the settlement and an opportunity to object are not required.  *Moore,* 2009

WL 2848858, at *1.  Workers who have not joined the case are not bound by this settlement. *Id*.;

29 U.S.C. § 216(b).

12

Courts reviewing a proposed FLSA collective action settlement must find that the litigation involves a bona fide dispute and that the proposed settlement is fair and equitable to all parties concerned. *See, e.g., Lynn's Food Stores,* 679 F.2d at 1354; *Collins,* 568 F. Supp. 2d at 718-19. In conducting the fairness inquiry, courts regularly apply Rule 23 factors by analogy, while focusing on the statutory policy of protecting a minimum standard of compensation. *See, e.g., Moore,* 2009 WL 2848858, at *2; *Collins*, 568 F. Supp. 2d at 722. These factors include: 1) the extent of discovery that has taken place; (2) the stage of the proceedings, including the complexity, expense, and likely duration of the litigation; (3) the absence of fraud or collusion in the settlement; (4) the experience of counsel who have represented the plaintiffs; (5) the opinions of class counsel, class representations and class members; (6) the probability of plaintiffs' success on the merits and the amount of the settlement in relation to the potential recovery. *See, e.g., Moore*, 2009 WL 2848858, at *2; *Collins,* 568 F. Supp. 2d at 722; *Houston*, 2009 WL 2474055, at *6; *Camp*, 2004 WL 2149079, at *7. While courts give comprehensive consideration to all relevant factors, there is a "strong presumption in favor of finding the settlement fair" and the bona fide dispute inquiry "must not be turned into a trial or a rehearsal of the trial." *Collins,* 568 F. Supp. 2d at 722.

## V.   THE AGREEMENT IS FAIR AND REASONABLE

An application of these factors demonstrates that a bona fide dispute exists between the parties concerning Plaintiffs' claims and that the proposed settlement is fair and equitable to all parties. *See Lynn's Food Stores*, 679 F.2d at 1354. PPC has analyzed the factors described above and believes that the Agreement satisfies the above standards. While PPC disputes the allegations raised by Plaintiffs and denies any liability, in order to avoid protracted litigation, PPC has determined that it is in the best interests of the company to resolve these actions on the terms set forth in the Agreement. Further, the federal judiciary has a strong policy of promoting

13

and encouraging settlements between litigating parties, particularly in class actions or complex cases.  *See, e.g., Cohn v. Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.").

> **A.** **The Extent of Discovery that Has Taken Place and the Stage of the Proceedings, Including the Complexity, Expense, and Likely Duration of the Litigation Favor Settlement.**

The parties have been litigating this dispute concerning PPC's overtime pay practices for nearly four years.  The parties took more than 60 fact witness depositions in the MDL action and underlying litigation,[9] and reviewed over ten thousand pages of documents.  The parties had a fair and full opportunity to develop the record and evaluate the strengths and weaknesses of the case through discovery and motion practice.  Both sides exchanged expert reports measuring the time workers spend on donning, doffing and related activities based on multi-day time studies performed at various plants.  In addition, PPC had the opportunity to depose Plaintiffs' time study expert.   As the parties reached an agreement to settle this action only two weeks before the estimation hearing was scheduled to commence, the litigation had certainly reached a point at which the parties were able to make an informed assessment of the case merits and the probable future course of the litigation.  *See In re Fed. Skywalk Cases*, 97 F.R.D. 380, 389 (W.D. Mo. 1983) (after a year and a half of discovery, all parties had a comprehensive knowledge of the facts on which to base an intelligent assessment of settlement).  Accordingly, the significant discovery conducted supports approval of the Agreement.

---

[9]   The parties took approximately 12 depositions prior to the MDL transfer in the Pennsylvania action.

Had the parties not reached a settlement, substantial additional work and costs would have been required to resolve this action. The parties had scheduled expert depositions of PPC's time study expert and Plaintiffs' statistical expert in addition to completing the remaining fact witness depositions. Further, preparation for the two-week estimation hearing would have required significant work by multiple attorneys to prepare trial briefs, witness and exhibit lists, deposition designations, and resolve outstanding evidentiary issues. Further, the parties anticipated considerable briefing on issues such as the application of PPC's defense under §203(o) and motions to exclude the parties' respective experts. Moreover, the parties would have incurred significant expense in transporting the necessary witnesses to this Court from around the country, preparing witnesses for trial, and participating in a two-week estimation hearing, followed by post-trial briefing.

### B.    The Absence of Fraud or Collusion in the Settlement Favors Approval.

An initial presumption exists that the settlement is fair where counsel for the parties negotiate a settlement at arm's length. *Murillo v. Texas A&M Univ. Sys.*, 921 F. Supp. 443, 445 (S.D. Tex. 1996). The presumption is established if the court finds that the parties arrived at the settlement through arm's length bargaining; the parties and court were sufficiently aware of the issues for litigation; and counsel for the parties are experienced in similar litigation. *See id.* at 446. The recommendation by Plaintiffs' counsel and the good faith bargaining between the parties also militates heavily in favor of approving the settlement, as "[c]outs have consistently refused to substitute their business judgment for that of counsel, absent evidence of fraud or overreaching . . . ." *Id; see Houston*, 2009 WL 2474055, at *6.

The arms-length nature of the relationship between the parties to this action may be most clearly demonstrated, as the Court could observe personally, by the vigor with which the parties contested virtually every facet of this litigation. In addition, the settlement of this action was

only achieved after multiple sessions of mediation, first in May 2008, during which the parties

exchanged and analyzed pay and time record data of a representative sample of the workers,

followed by additional mediation sessions convened by telephone that concluded only two weeks

before the Estimation Hearing was scheduled to commence.

C.      **Experience of Counsel and the Opinions of Counsel and Named Plaintiffs
        Support Settlement.**

Plaintiffs have been represented by counsel well-experienced in FLSA litigation, many of

whom have actively litigated similar claims for unpaid donning and doffing time against other

chicken processing companies.  *See* Sellers Decl. ¶ 2, Ex. B.  Counsel believes that the

Agreement is in the best interests of the Plaintiffs and represents a significant recovery given the

risks in proceeding to an estimation hearing on these claims.  *See id* at ¶4.  Counsel for the

Plaintiffs have become intimately familiar with the facts and legal issues involved in this case.

Based on their knowledge of the case and the applicable law, as well as their experience in

litigating FLSA claims, counsel believes the settlement is fair, reasonable and adequate.   The

views of counsel about the settlement, while not binding on the Court, nonetheless are due

considerable deference as they reflect the views of the lawyers most familiar with the case and

the record.  *See EEOC v. McDonnell Douglas Corp.*, 894 F. Supp. 1329, 1335 (E.D. Mo. 1995).

Further, the Named Plaintiffs support this agreement.  Eleven of the 12 Named Plaintiffs

in the Consolidated Complaint have affirmatively consented to the proposed settlement,[10] and

none have opposed it.  Moreover, as each worker who consented to join the action agreed to be

represented by the Named Plaintiffs, the support of the Named Plaintiffs for the settlement

---

[10]  Despite numerous attempts to reach Named Plaintiff Erica Gresham, counsel have been
unable to discuss the settlement with her, as she has failed to keep counsel advised of the means
to contact her.  Sellers Decl. ¶ 10, Ex. B.

should reflect support of the other members of the collective action. The court-approved consent

form workers signed to join this action, provides, *inter alia:*

> By joining this litigation, I agree to be represented by those plaintiffs who have
> been or will be named in the litigation that my counsel has filed, to the fullest
> extent possible under applicable laws, to make decisions on my behalf concerning
> all matters relating to this litigation, including the method and manner of
> conducting and resolving the litigation, and the terms of representation by the
> attorneys.

Consent to Join Action, doc. 51-1.

Accordingly, the workers who have consented to join this action have agreed to abide by

the settlement decision of the Named Plaintiffs in this action, which further supports approval of

this Settlement. *See, e.g., Moore,* 2009 WL 2848858, *2.

### D. The Probability of Plaintiffs' Success on the Merits and the Amount of the Settlement in Relation to the Potential Recovery.

#### 1. Amount of Settlement in Relation to Potential Recovery

Of the funds payable to resolve this action, $4,700,000 will be allocated to the Named

Plaintiffs and all other eligible members of the collective action to satisfy their claims to back

wages and damages.  This sum represents approximately 85% of full single damages recoverable

by members of the collective action had Plaintiffs prevailed in establishing both liability and

their entitlement to the full amount of backpay as calculated by Plaintiffs' experts. *See* Sellers

Decl. at ¶ 5.  Dr. Mericle measured the time workers spend donning, doffing, sanitizing and

walking to and from their place on the production line, based upon filming at two representative

facilities.  Plaintiffs' expert in labor economics, Dr. Lanier used these time studies and pay and

time records from across PPC's facilities as a basis to calculate unpaid time due to the members

of the collective action.  Sellers Decl. at ¶ 6.  Dr. Lanier's damage model accounted for multiple

factors, such as whether the facility had one or two unpaid meal breaks as well as the number of

compensable workweeks within the two years prior to the date of each worker's consent filing.

*Id.*   Accordingly, the Agreement provides a significant recovery for the workers based on their experts' calculation of damages and the evidence acquired through discovery.  *See Manual for Complex Litig.* § 21.62 (4th ed. 2009); *see also*, *Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 446 (S.D. Iowa 2001).

2.   <strong><u>Risks of Continued Litigation</u></strong>

a.   <strong>Effect of *Anderson v. Pilgrim's Pride* Decision</strong>

Continued litigation of these claims would have presented numerous complex legal and factual issues putting Plaintiffs' ability to recover at risk.  First, PPC relied upon the decision in *Anderson v. Pilgrim's Pride Corp.*, 147 F. Supp. 2d 556 (E.D. Tex. 2001), *aff'd* 44 Fed. Appx. 652 (5th Cir. 2002), where the court found that time spent donning and doffing by chicken processing workers at three plants in Texas was not compensable.[11]  The decision found in favor of PPC on a number of its potential defenses, including that the time at issue was *de minimis* and thus may be disregarded, and that the activities performed at the beginning and end of the workday were excluded from compensation by § 203(o).  PPC also asserted that the *Anderson* decision provided Pilgrim's with a defense to a finding of willfulness, which would prevent a three-year statute of limitations under  29 U.S.C. § 255,  and that its reliance on this decision provided a good faith defense against liquidated damages under 29 U.S.C. § 251.  Plaintiffs argued that the *Anderson* decision has been eclipsed by later authority, including the Supreme Court's decision in *Alvarez,* 546 U.S. 21 and its progeny.  *See, e.g., De Ascencio v. Tyson Foods, Inc.,* 500 F.3d 361 (3d Cir. 2007); *Jordan v. IBP,* 542 F. Supp. 2d at 803-809 (M.D. Tenn. 2008). Plaintiffs further contended that PPC's failure to change its practices after the DOL notified it of

---

[11]   The case concerned plants in Mt. Pleasant (nonunion) and in Nacogdoches and Lufkin (union).

FLSA violations, subsequent to the *Anderson* decision, prevented reliance on a good faith defense.  Nonetheless, the *Anderson* decision placed Plaintiffs' ability to recover for a three-year statute of limitations and liquidated damages significantly in question.

      3.      **Pilgrim's section 203(o) defense.**

On November 9, 2009, PPC filed a Motion for Summary Judgment asserting the applicability of § 203(o) of the FLSA, which excludes from hours worked "any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee."  29 U.S.C. § 203(o).  Although the Court denied this motion on November 10, 2009, finding insufficient time to resolve it prior to the estimation hearing, the Court noted that the parties may raise the issue in pre- and post- trial briefings.  (doc. 23)  Given that approximately 78% of the workers who joined this action worked at unionized plants, a significant risk existed that these workers may have been precluded from recovering compensation for at least some of the time worked at the beginning and end of the work day.  In light of the split in circuit court authority over the interpretation of § 203(o), as well as the DOL's conflicting interpretations of this section, the uncertainty over the viability of this defense left in question whether Plaintiffs would recover compensation for a significant portion of the unpaid time they have worked.[12]  *See, e.g.*, *Collins,* 568 F. Supp 2d at 724.  In light of the possibility that this defense alone would have been

---

[12]  *Compare* Op. Ltr. Adm'r, Wage & Hour Div., FLSA2002-2 (U.S. Dep't of Labor, June 6, 2002) (interpreting the term "clothes" in § 203(o) to include the protective safety equipment typically worn by meat packing employees) with January 2001 DOL opinion letter, concluding the opposite. *See Perez v. Mountaire Farms, Inc.,* Civil No. AMD 06-121, 2008 WL 2389798, *5 (D.Md. June 10, 2008).

available to PPC, the recovery of 85% of unliquidated damages in settlement suggests the terms of the Agreement are eminently fair to the class.

### 4.     Risks in Proving Damages.

Even if Plaintiffs prevailed in establishing liability at the estimation hearing, proving the amount of uncompensated time due to each worker presented several complex questions.  The parties' experts each conducted multi-day time studies with widely divergent measures of the uncompensated time at issue.  PPC's time study expert, industrial engineer, Dr. Jeffrey K. Fernandez, disputed the time measurements calculated by Plaintiffs' expert on multiple grounds, including a disagreement over which activity constituted the "first compensable act" to trigger the start of the continuous workday and whether all activities following the first compensable act should be included as compensable time.  Indeed, Dr. Fernandez estimated the potential uncompensated time at issue to be less than 50% of Plaintiffs' expert's measure of the time workers spend donning, doffing, sanitizing and walking.

Further, given the expedited nature of the discovery required by the bankruptcy proceeding, Plaintiffs confronted the challenge of establishing the average unpaid time for workers at 23 plants, based on discovery conducted at five representative facilities.   Moreover, the pay and time records PPC produced revealed that for a significant number of workweeks, Plaintiffs would not have qualified for any overtime pay as their work hours, with donning and doffing time included, were under the 40 hours a week required to earn overtime. *See* 29 U.S.C. § 207(a)(1).  Accordingly, if PPC prevailed in establishing its lower unpaid time estimates, this would have significantly reduced Plaintiffs' backpay recovery, both because workers would be entitled to compensation for fewer unpaid minutes per day, and because workers would have had fewer workweeks with at least the 40 hours of work to earn overtime.

As such, the proposed settlement is fair and reasonable considering the strength and nature of theses claims in light of Pilgrim's potential defenses and the risks entailed in continuing the litigation.

### E.      The Proposed Attorneys' Fees Are Reasonable

As part of its fairness determination, the Court must also determine that the proposed attorneys' fees are reasonable.  *See Strong v. BellSouth Telecomms.*, 137 F.3d 844, 849-50 (5th Cir. 1998); *see also Zoll v. Eastern Allamakee Cmty School Dist.*, 588 F.2d 246, 252 (8th Cir. 1978).[13]  The FLSA has a fee-shifting provision, which provides that the prevailing party shall recover reasonable attorneys' fees and litigation costs.  29 U.S.C. § 216(b).  The federal courts have long recognized the profound importance of plaintiffs' right to recover attorneys' fees under the FLSA.  *See, e.g., Shelton v. Ervin*, 830 F.2d 182, 183 (11th Cir. 1987) (FLSA's fee recovery provision is not collateral to the merits of an FLSA lawsuit but, rather, is an "integral part of the merits" of the lawsuit.  There is no numeric relationship required between the amount of economic losses recovered and the amount of fees recoverable.  Congress has determined that it is important for FLSA rights to be enforced, and that reasonable attorneys' fees must be awarded in order to provide for such enforcement, particularly where the victims of FLSA violations are often low-wage workers whose per-person damages may not be significant.  *See, e.g., Fegley v. Higgins*, 19 F.3d 1126, 1134-45 (6th Cir. 1994) (FLSA fee award "'encourages

---

[13] The Eighth Circuit has identified the following factors for courts to consider in reviewing the reasonableness of attorneys' fees: (1) the time and labor required, (2) the novelty and difficulty of the question, (3) the skill requisite to perform the legal services properly, (4) the preclusion of other employment due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, (10) the undesirability of the case, (11) the nature and length of the professional relationship with the client and (12) awards in similar cases.

the vindication of congressionally identified policies and rights'"). Thus, it is not uncommon for attorney fee awards to exceed the amount recovered by plaintiffs in lost wages.[14] In light of the long and complex history of this case, and the significant recovery of unpaid overtime for the members of the collective action, the attorneys' fee award requested is fair and reasonable. *See Zoll,* 88 F.2d at 252 ("the minimum award should generally be not less than the number of hours claimed times the attorney's regular hourly rate").

As previously set forth, after reimbursement of expenses, Plaintiffs' counsel seek a payment of $4,612,954.81, to be allocated to counsel as attorneys' fees. This total attorneys' fee represents approximately 68% of the actual lodestar fees generated in prosecuting all of the underlying actions in the transferor courts, this MDL proceeding, the bankruptcy proceeding, and the settlement proceedings. *See* Sellers Decl. at ¶8. The firms representing Plaintiffs have expended a total of approximately 19,621 hours pursuing this litigation, which is an effective average hourly rate of $ 235.10 per hour based upon the attorney's fee award requested. The attorneys' fees requested also include all time counsel for Plaintiffs will spend implementing and monitoring the Agreement. In this case, the Court does not have to apportion the fees among Plaintiffs' counsel, as they have already reached an agreement to divide them in accordance with CMO-3 at 5. *See  Longden v. Sunderman,* 979 F.2d 1095, 1101 (5th Cir. 1992) (approving

---

[14] *See City of Riverside v. Rivera*, 477 U.S. 561, 574, 578 (1986) (no rule of proportionality in cases awarding fees under § 1988, in order to ensure lawyers available to represent persons with legitimate claims). This principal has been applied in many cases in the FLSA context. *See, e.g., Hodgson v. Miller Brewing Co.*, 457 F.2d 221, 228-29 (7th Cir. 1972); *Perdomo v. Sears, Roebuck & Co.*, Case No. 97-2822-CIV-T-17A, 1999 U.S. Dist. LEXIS 20881, *24 (M.D. Fla. Dec. 3, 1999); *Wales v. Jack M. Berry, Inc*., 192 F.Supp.2d 1313, 1327 (M.D. Fla. 2001); *Heder v. City of Two Rivers*, 255 F.Supp.2d 947, 955 (E.D. Wis. 2003); *Perrin v. John B. Webb & Assocs.*, Case No. 6:04-cv-399-Orl.-KRS, 2005 U.S. Dist. LEXIS 35473, *11-12 (M.D. Fla. Oct. 6, 2005) ("in order for plaintiffs with minimal claims to obtain counsel, those counsel must be able to recover a reasonable fee for their time").

private fee-sharing agreement amongst counsel).  This Court entered CMO-3, which governed

the organization of all 15 cases and counsel and appointed Lead counsel, a Steering Committee,

and liaison counsel. CMO-3 at 3-5 (doc. 39).  In the course of this litigation more than 20 law

firms represented the workers in the underlying actions and MDL proceeding.  In accordance

with CMO-3, lead counsel assigned work as needed to ensure the efficient litigation of the case

and avoid the unnecessary expenditures of time and expenses.  *See id.* at 5. Firms submitted

detailed time and billing records to lead counsel pursuant to CMO-3.

PPC does not oppose Plaintiffs' counsel's request for fees.  The hourly rates charged by

Plaintiffs' counsel and the amount of hours worked are reasonable based on the prevailing

market rates.   Moreover, the complexity of the procedural and factual issues of these cases, the

inability of Plaintiffs' counsel to handle other matters due the total hours consumed by these

cases, and the degree of success in the terms of the settlement, justify the requested fee award.

## VI.   <u>CONCLUSION</u>

For all the foregoing reasons, the Agreement is fair and reasonable.  Accordingly,

Plaintiffs' respectfully request that the Court grant the relief requested, and such other and

further relief as it deems just and proper, and enter the proposed Order, attached hereto.

Date:   March 31, 2010                           Respectfully submitted,

    */s/ Joseph M. Sellers*
Joseph M. Sellers
Jenny R. Yang
**COHEN MILSTEIN SELLERS
& TOLL, PLLC**
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C.  20005-3934
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Plaintiffs'
Motion for Approval of Settlement Agreement was served, this 31st day of March, 2010, upon
all counsel of record via the Court's ECF system, including the following:

**John B. Brown**
Gardere
3000 Thanksgiving Tower
1601 Elm Street
Dallas, TX  75201
jbrown@gardere.com

/s/          *Jenny R. Yang*
Jenny R. Yang